Iosef GOLDINGER, et al., Plaintiffs,

v.

DATEX–OHMEDA CASH BALANCE PLAN, Defendant.

Case No. C07–2081RAJ.

United States District Court,
W.D. Washington,
at Seattle.

March 31, 2010.

James Daniel Oswald, Law Offices of James D. Oswald, Seattle, WA, Ronald Dean, Ronald Dean ALC, Pacific Pallisades, CA, for Plaintiffs.

Adrienne E. Nelson, Seyfarth Shaw, San Francisco, CA, Mark Casciari, Seyfarth Shaw, Chicago, IL, Courtney E. Mertes, Jeffrey Bennett Youmans, Davis Wright Tremaine, Seattle, WA, for Defendant.

## ORDER

RICHARD A. JONES, District Judge.

### I. INTRODUCTION

This matter comes before the court for the resolution of a legal issue that Plaintiffs first raised in their trial brief, and has now been the subject of supplemental briefing and oral argument. The court's resolution today means that there is no need for a trial at this time. Trial may be necessary later, however, because this or-der leaves two questions unresolved: was the ERISA plan at issue partially terminated, and, if so, what are Plaintiffs' and other class members' damages. The court sets a trial date of September 20, 2010. This order concludes by directing the parties to determine when and how they will resolve what remains of this dispute.

### II. BACKGROUND

Plaintiffs represent a class of former employees of Spacelabs Medical, Inc. ("Spacelabs") who participated in the Datex–Ohmeda Cash Balance Plan (the "Plan"), a defined-benefit pension plan. The Plan is subject to the Employee Retirement Income Security Act ("ERISA"). Through a series of corporate transactions occurring after General Electric Company acquired Spacelabs' corporate parent, Spacelabs was sold to another corporation in March 2004. As of the date of the sale, Spacelabs employees ceased to accrue service time under the Plan.

Participants vested in the Plan incrementally based on how long they had worked at Spacelabs. The Plaintiffs and class members are Spacelabs employees who were not 100% vested in the Plan when the 2004 Spacelabs sale occurred. It appears that the Plan awarded Plaintiffs benefits, but only to the extent that they were vested. Plaintiffs then applied for additional benefits, contending that they should have become 100% vested when they were eliminated from the Plan in a partial termination. Plan fiduciaries denied their claims both initially and on an internal appeal. In each case, the fiduciaries declined to decide whether a partial termination had occurred, but determined that Plaintiffs did not become 100% vested because the Plan was underfunded. This suit followed.

With the parties' consent, the court certified a class in September 2008 of all Plan

participants who were less than 100% vested in their benefits at the time of the Spacelabs sale. This action progressed slowly,[1] but was set for a bench trial on January 25, 2010. At the parties' request, the bench trial was set to resolve only whether the Plan fiduciaries properly denied Plaintiffs' benefits. Even had Plaintiffs prevailed at the bench trial, the parties would still have needed to address whether a "partial termination" of the Plan occurred, and, if so, what Plaintiffs' and class members' damages were.

In Plaintiffs' trial brief, they articulated for the first time a purely legal argument that could obviate the need for the January 2010 trial. They contended that the Summary Plan Description ("SPD"), an 18–page booklet, unambiguously provided that every Plan participant who was less than 100% vested in his or her benefits would become fully vested upon a termination or partial termination of the Plan. Relying principally on *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139 (9th Cir.2002), Plaintiffs argued that the unambiguous SPD provision, as a matter of law, trumped any inconsistent provision in the 46–page master Plan document.

The court found Plaintiffs' argument sufficiently compelling that it questioned the need for a bench trial. After the court requested the parties' input, they confirmed that if the court agreed with Plaintiffs' view of the SPD and the law, there was no need for the bench trial. Defendant requested the opportunity to submit additional briefing on the issue and to offer oral argument.

In its supplemental briefing, Defendant introduced a new legal issue. It contended that it was not enough for Plaintiffs to point to an unambiguous SPD provision favoring them, they must also demonstrate that they relied on the SPD provision. In Defendant's view, Plaintiffs did not rely on the SPD as a matter of law, and thus not only was a bench trial unnecessary, but Defendant was entitled to judgment in its favor.

The court now turns to each argument.

## III. ANALYSIS

■ Although no party filed a motion to address these legal issues, they could have been addressed in either a motion to dismiss or a motion for summary judgment.[2] In any case, the court defers to neither party when answering legal questions. *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999). This order does not resolve any factual disputes.

### A. Defendant is Bound By the SPD Clause That Unambiguously Provides Full Vesting in a Termination or Partial Termination of the Plan.

■ ERISA requires that every employee subject to a qualifying plan receive an SPD. 29 U.S.C. § 1022(a). An SPD must be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* The SPD is the participant's "primary source of information regarding employment benefits," and is itself part of the

---

1. Only seven civil cases on this court's docket (out of approximately 200) are older than this one. Each of those seven cases has either been resolved pending confirmation by the court or has been stayed because of appeals or administrative proceedings.

2. Indeed, the court queries why neither party raised these purely legal, potentially dispositive issues in a motion to dismiss or motion for summary judgment. These issues could have been resolved years ago.

plan. *Bergt*, 293 F.3d at 1143. The plan document that contains all provisions of the plan without summarization or simplification is typically called the master plan document.[3]

### 1. The SPD Unambiguously Provides that All Participants Become 100% Vested Upon a Partial Termination of the Plan.

The SPD contained the following paragraph under the heading "If the Plan is Amended or Terminated":

> Although the plan is expected to be permanent, the Company reserves the right to terminate the plan in whole or in part at any time. If the plan is terminated, or if there is a partial termination affecting you, you will immediately be 100% vested as of the termination date. Benefits will be paid according to law. No money in the fund can be returned to the Company until all required benefits have been met. Trust fund assets would be used to provide benefits to retirees, employees, spouses, and beneficiaries. If for any reason the funds are insufficient to pay full benefits to all eligible persons, payments would be made in an order prescribed by law.

SPD at 16. Plaintiffs contend that the second sentence's promise that plan participants will be "immediately 100% vested as of the termination date," is an unambiguous provision establishing that they became 100% vested when they were eliminated from the Plan in conjunction with the Spacelabs sale. Defendant contends that the sixth sentence's statement that "payments would be made in an order prescribed by law" in the event that "funds are insufficient to pay full benefits to all eligible persons," shows that the promise

of 100% vesting was conditioned on the Plan having adequate funding.

 The court holds that the SPD unambiguously provides for 100% vesting in a partial termination of the Plan, regardless of Plan funds. The court begins by observing that any reasonable reader of the SPD would understand that the terms "vesting" and "benefits" refer to distinct aspects of Plan participation. The SPD explains "When Benefits Are Payable to You" as follows:

> If you leave the Company before retirement, you will receive the "vested" portion of your account. Vested means you have earned a right to your account, based on your length of service. Vesting is described on page 14.

SPD at 8. Turning to page 14, a reader would learn immediately about "'vesting' under the plan—that is, your eligibility to receive plan benefits when you leave the company." SPD at 14. That is wholly consistent with the SPD's section entitled "Vesting," which explains that "'Vesting' is how you earn a right to plan benefits." SPD at 10. The SPD then provides a "vesting schedule" which shows that plan participants become incrementally more vested in their accounts as their years of service increase, culminating in 100% vesting after 7 years of service. SPD at 10. Any reasonable reader of the SPD would understand that "benefits" are payments that the plan makes to participants after they retire. The portion of the SPD entitled "When Benefits are Payable to You" makes this explicit. SPD at 8. It also makes explicit a participant who leaves the Company before retirement "receive[s] the 'vested' portion of [his or her] account." *Id.*

Applying the SPD's unambiguous explanations of vesting and benefits, it becomes

---

**3.** The master plan document and the SPD are found at Exhibits A and B, respectively, of the Declaration of Roberta Krueger. Dkt. # 29.

The court cites the SPD by page number, and the master plan document by clause number.

apparent that the SPD unambiguously provides that any employee subject to a partial termination becomes 100% vested. The only sentence in the clause the parties' cite that mentions vesting states that "[i]f the plan is terminated, or if there is a partial termination affecting you, you will immediately be 100% vested as of the termination date." Standing alone, this sentence is unambiguous, and even Defendant has no argument to the contrary. The court does not read the sentence in isolation, however, it looks for any other statement in the SPD that might qualify it. The court finds none. The clause that Defendants rely on is simply unrelated to vesting. It provides that "[i]f for any reason the funds are insufficient to pay full benefits to all eligible persons, payments would be made in an order prescribed by law." This does not limit the 100% vesting the SPD promises, it simply states that if the plan lacks funds to pay "full benefits," any eligible person (including persons who are 100% vested) may not receive full benefits, because in that event payments would be made in "an order prescribed by law." Thus, if there were not enough funds, a person who was 100% vested might receive smaller benefit payments than he would have if the Plan were fully funded. The sixth sentence does not limit vesting, it limits benefit payments.[4] It would have been trivial to include a limitation on vesting based on the Plan's funding, such as adding the following clause to the end of the second sentence: "unless the Plan has insufficient funds." Without such a modification, however, the SPD unambiguously provides for immediate full vesting to all participants affected by a partial termination.

The terms of the master Plan document apparently do not provide for 100% vesting upon partial termination of the plan. The court need not examine this issue further, because parties have conceded that the master Plan document is inconsistent with the SPD in this regard. Pltf.'s Tr. Br. (Dkt. # 68) at 5 (citing § 9.3 of master Plan document); Def.'s Supp. Tr. Br. (Dkt. # 80) (citing same clause).

## 2. The Plan Document More Favorable to Plan Participants—In this Case the SPD—Controls.

The court must now determine how to reconcile the conflict between the SPD and the master Plan document. Defendant contends that there is no Ninth Circuit authority on point. Plaintiffs contend that *Bergt* dictates that the Plan document that favors the participants, in this case the SPD, should govern. The *Bergt* court had no occasion to expressly determine what result obtains when the SPD is the more favorable document, because the *Bergt* court considered an SPD that was less favorable to participants than the master Plan document. *Bergt* held that the unambiguous provisions of a master plan document, if more favorable to plan participants, control despite an unambiguous and less favorable provision in an SPD. 293 F.3d at 1145.

Defendant suggests that because the *Bergt* panel did not confront the precise issue that this case raises, the court should ignore *Bergt*. The court cannot dismiss *Bergt* so easily. To begin with, *Bergt* was the first Ninth Circuit panel to decide how to resolve conflicts between unambiguous provisions in different plan documents.

---

**4.** The parties' briefing contains some discussion of what the sixth sentence means in the event that it does not limit vesting. This order does not resolve that question for two reasons. First, that question pertains to damages, an issue whose resolution the parties have chosen to delay. Second, the court believes that the parties will be able to better address the meaning of the sixth sentence, both in their own discussions regarding the case and in future briefing, with the benefit of this order.

Prior cases, as the court will later discuss, did so only in dicta. *Bergt* looked to five cases from five other circuits addressing the issue. In each of those cases, "the SPD conflicted with, *and was more favorable to the employee,* than the master plan document." *Bergt,* 293 F.3d at 1145 (emphasis added). By "follow[ing] this same reasoning," the *Bergt* court "conclude[d] that when the plan master document is more favorable to the employee than the SPD, and unambiguously allows for eligibility of any employee, it controls, despite contrary unambiguous provisions in the SPD." *Id.* Because the *Bergt* panel "follow[ed] the same reasoning" as five other circuit courts that had ruled that an unambiguous SPD provision favoring the employee trumps a less favorable unambiguous provision in the master plan document, it defies logic to contend that the Ninth Circuit would not reach the same result in this case. If *Bergt* had meant to engage in such jurisprudential gymnastics—disagreeing with the holdings of the five cases it relied upon while expressly adopting the reasoning of each case—the court expects that the *Bergt* panel would have said as much.

The court's conclusion, moreover, finds ample support both in *Bergt* and cases decided before and after *Bergt. Bergt* noted the need to "construe ambiguities in an ERISA plan against the drafter...." *Id.* (quoting *Barnes v. Independent Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan,* 64 F.3d 1389, 1393 (9th Cir. 1995)) (ellipses in *Bergt*). That maxim applies with equal force to the master plan document and the SPD, both of which are part of an ERISA plan. Subsequent Ninth Circuit panels have cited *Bergt* for the proposition that "[c]ourts will generally bind ERISA defendants to the more employee favorable of two documents—even if one is erroneous." *Banuelos v. Const. Laborers' Trust Funds,* 382 F.3d 897, 904 (9th Cir.2004). District courts within the

Ninth Circuit have interpreted *Bergt* similarly to mandate the application of whatever plan document is more favorable. *E.g., McHenry v. PacificSource Health Plans,* 643 F.Supp.2d 1236, 1242 (D.Or.2009) ("The document more favorable to the participant controls.") (citing *Bergt* ); *Wiley v. Cendant Corp. Short Term Disability Plan,* 631 F.Supp.2d 1221, 1224 (N.D.Cal. 2009) ("[I]f there are two conflicting documents, even if one is erroneous, courts generally bind ERISA defendants to the more employee-favorable document ....") (citing *Banuelos* and *Bergt* ); *Boyd v. United Trans. Union Ins. Ass'n,* No. C06–1413JLR, 2006 WL 581025, at *3, 2006 U.S. Dist. LEXIS 12201, at *8 (W.D.Wash. Mar. 7, 2006) ("When plan documents, such as an SPD, contain provisions that conflict with the plan ..., courts apply the provision more favorable to the employee in order to place the burden of ambiguity on the party who drafted the conflicting documents."). Both the *Boyd* and the *Wiley* court applied this rule to hold that the more favorable provisions of the SPD govern over conflicting provisions in the master plan document. *Boyd,* 2006 WL 581025 at *3–4, 2006 U.S. Dist. LEXIS 12201 at *10–12; *Wiley,* 631 F.Supp.2d at 1224.

■ Ninth Circuit authority preceding *Bergt* supports the same result. In *Atwood v. Newmont Gold Co.,* the court stated that where an SPD fails to explain circumstances that can lead to a denial of benefits, "and differs materially from the terms of the plan, the SPD is controlling." 45 F.3d 1317, 1321 (9th Cir.1995), overruled on other grounds by *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955 (2006). Similarly, in *Arnold v. Arrow Transp. Co.,* the court observed that an SPD can expand benefits beyond those provided in a master plan document. 926 F.2d 782, 785 n. 3 (9th Cir.1991). These

statements are dicta, because each court ultimately concluded that the SPD was not inconsistent with other plan documents. Nonetheless, both cases support the conclusion that a participant-favoring unambiguous SPD provision trumps a less favorable provision of another plan document.

Finally, the court observes that district courts within the Ninth Circuit also ruled, prior to *Bergt*, that unambiguous SPD provisions control. Defendant cited three of those cases, albeit in an effort to persuade the court to adopt the reliance requirement discussed in Part III.B, *infra*. Those cases are *Adams v. J.C. Penney Co.*, *supra*, *Berry v. Blue Cross of Washington & Alaska*, 815 F.Supp. 359 (W.D.Wash. 1993), and *Kaiser Permanente Employees Pension Plan v. Bertozzi*, 849 F.Supp. 692 (N.D.Cal.1994). In each, the court adopted Plaintiffs' position. *Adams*, 865 F.Supp. at 1459 ("consistent with the Fourth, Fifth, Sixth, and Eleventh Circuits, as well as the dictum in the Ninth, this court finds that where the SPD and the policy conflict, the SPD will prevail"); *Berry*, 815 F.Supp. at 364 ("The Court adopts the reasoning of the Fifth, Sixth, and Eleventh Circuits and holds that the language of a plan summary controls"); *Bertozzi*, 849 F.Supp. at 698 ("Case law provides that where the terms of the SPD and the plan conflict, the terms of the SPD govern a claim for benefits.").

■ The court concludes, in summary, that the SPD unambiguously provides that all employees not already 100% vested in the Plan became 100% vested upon its partial termination. *Bergt*, its predecessors, and its progeny, dictate that the SPD provision governs over any less favorable provision of the master Plan document.[5]

## B. Plaintiffs Need Not Prove That They Relied on the SPD.

Defendant contends that Plaintiffs can only prevail by showing that they relied on the provision of the SPD that makes them 100% vested, and that they cannot prove reliance. Defendant concedes that the Ninth Circuit has never decided whether a plaintiff invoking the more favorable of two unambiguous conflicting documents must prove that he relied on the favorable provision. Defendant urges the court to adopt the reliance rule imposed in *Skinner v. Northrop Grumman Retirement Plan B*, No. CV 07–3923–JFW (JTLx), 2010 WL 679061, 2010 U.S. Dist. LEXIS 6591 (N.D.Cal. Jan. 26, 2010).

■ In *Skinner*, the court held that a plaintiff invoking an SPD provision that conflicts with other plan documents must prove reasonable reliance on the provision. 2010 WL 679061, at *7, 2010 U.S. Dist. LEXIS 6591, at *25. The court acknowledged that no Ninth Circuit authority reaches the same result. *Id.* at *6, *7, 2010 U.S. Dist. LEXIS 6591, at *20–21, *25. The court also concluded that to prove reliance, a plaintiff must prove that because of the SPD, he "did or did not take action resulting in the forfeiture of the very benefit sought" based on the SPD. *Id.* at *7–8, 2010 U.S. Dist. LEXIS

**5.** Defendant suggests that the standard of review somehow matters in the court's resolution today. Def.'s Supp. Br. at 5. Although the court has not yet decided what standard governs its review of the Plan fiduciaries' decisions, *Bergt* reviewed the fiduciaries' decisions for abuse of discretion. 293 F.3d at 1142–43. Although that standard affords maximum deference to fiduciaries, its application made no difference. *Id.* at 1146 ("[T]he unambiguous provisions of the plan master document control. As a result, the Committee abused its discretion by refusing to provide Bergt benefits under the retirement plan."). This court would reach the result it reaches today regardless of the level of deference it afforded the Plan's fiduciaries.

6591, at *28 (quoting *Adams v. J.C. Penney,* 865 F.Supp. 1454, 1460 (D.Or.1994)).

If the court were to impose a reliance requirement as the *Skinner* court formulated it, Plaintiffs could not prevail. Plaintiffs cannot prove reliance because the SPD did not induce them to act or not act in a way that led to the forfeiture of the benefit they seek (in this case, 100% vesting upon partial termination of the Plan). Instead, Plaintiffs did what most (if not all) Plan participants would have done. They worked at Spacelabs knowing that they had a pension plan. They unlikely paid any attention to the provisions of the Plan governing partial termination. What employee anticipates the sale of his company and the partial termination of its pension plan? Even if employees had determined long before the Spacelabs sale that, based on the unambiguous SPD, they would become 100% vested in a partial termination, they could not have relied on that determination. At most they could have continued working at Spacelabs in the belief that they would vest fully. The *Skinner* court determined that a participant's decision to continue working is "plainly insufficient" as a form of reasonable reliance. 2010 WL 679061 at *7–8, 2010 U.S. Dist. LEXIS 6591 at *28.

The strictures of the *Skinner* reliance requirement mean that, generally speaking, the rule that the court applied in the previous section will have no effect in any case where the more favorable plan provision addresses what benefits participants will receive when they retire or leave the company. Imagine an SPD that promised a full pension after ten years of work, whereas the master plan document promised a full pension only after twenty years of work. An employee who worked for ten

years, retired, and claimed benefits would receive nothing under the *Skinner* rule, because his "reliance" was nothing more than working at the company.

Although the Ninth Circuit has not squarely addressed whether reliance is necessary, other circuits have. Many have imposed reliance requirements. *Skinner,* 2010 WL 679061, at *6–7, 2010 U.S. Dist. LEXIS 6591, at *24–25 (citing *Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir.1992), and authority from six other circuits). Three circuits have deemed reliance unnecessary. *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 137 (6th Cir.1988), *Burstein v. Retirement Account Plan,* 334 F.3d 365, 381–82 (3d Cir.2003), *Washington v. Murphy Oil USA, Inc.,* 497 F.3d 453, 458–59 (5th Cir. 2007). Even among the circuits where reliance is necessary, there is a divergence of opinion as to what constitutes reliance. *See Washington,* 497 F.3d at 458 n. 1 ("[T]here appears to be a five-way circuit split regarding whether an ERISA claimant needs to establish reliance and/or prejudice based on the conflicting terms of an SPD."). Most circuits who require reliance demand a much less stringent showing than did the *Skinner* court. Were there no Ninth Circuit authority bearing on the issue, the court might discuss each circuit's view.[6] The court believes, however, that Ninth Circuit precedent addressing the effect of SPDs means that a panel confronting the issue now before the court would not impose a reliance requirement.

The *Skinner* court adopted its reliance requirement at least in part because it believed that to do otherwise would "impose strict liability on employers for a defective SPD." *Id.* at *7, 2010 U.S. Dist.

---

**6.** One law review article provides a thorough summary of leading authority from each circuit. Michael A. Valenza, *Accuracy is Not a Lot to Ask: Decisions in the Second and Third*

*Circuits Set the Tone for Litigation Over Conflicts Between ERISA Plan Documents and Summaries,* 6 Transactions: Tenn. J. Bus. L. 361 (Spr.2005).

LEXIS 6591 at *25. It believed that the reliance requirement was necessary to avoid an "actuarial and funding nightmare" for plan fiduciaries by providing "unintended ... windfall[s]" to participants. *Id.* at *7, 2010 U.S. Dist. LEXIS 6591 at *26 (quoting *Bance v. Alaska Carpenters Retirement Plan*, 829 F.2d 820, 825 (9th Cir.1987)). *Skinner*, like many opinions addressing SPDs that conflict with other plan documents, often refers to the favorable SPD provision as "defective" or "faulty." 2010 WL 679061, at *6, 6, 6–7, 7, 7, 7–8, 2010 U.S. Dist. LEXIS 6591, at *19, 21, 24, 25, 26, 28. *See also, e.g., Banuelos*, 382 F.3d at 904 (referring to "erroneous" provision). *Bergt* leaves no doubt that a court cannot consider extrinsic evidence to resolve conflicts between unambiguous provisions in different plan documents. 293 F.3d at 1143, 1145. In some cases, intrinsic evidence may reveal that an SPD provision is inconsistent with other plan documents such that it is likely the SPD was drafted in error. In a case like this one, the court has no means to determine whether the SPD or the master Plan document is "defective." It is just as likely that the master Plan document's limitation on vesting in a partial termination is in error. It may be that the court would prevent a windfall in this case by giving Plaintiffs the relief they seek.

The *Skinner* court did not expressly acknowledge the countervailing consideration to its reluctance to give the plaintiff a windfall, which is that a reliance requirement undercuts the incentive to draft SPDs to accurately reflect the terms of a plan. SPDs are participants' "primary source of information regarding employment benefits." *Bergt*, 293 F.3d at 1143. Congress controls the content of SPDs because they must "be sufficiently accurate and comprehensive to reasonably apprise ... participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). SPDs matter,

in short, because the law does not expect plan participants to comprehend master plan documents. While an SPD that inadvertently expands benefits may create a windfall for participants, a rule that insulates plan administrators from liability for most errors in SPDs promotes careless drafting of SPDs and undermines the effectiveness of SPDs in apprising participants of their rights and obligations. Statutes and regulations tightly control the content of an SPD. 29 U.S.C. § 1022(b); 29 C.F.R. §§ 2520.102–2 to 2520.102–4. How are those controls to be effective if a reliance requirement means that even grievously inaccurate SPDs carry no consequences?

In *Bergt*, the court left little doubt as to whether a court should prefer the interests of the plan drafters or the participants when considering an ambiguity in the plan:

> Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask.

*Bergt*, 293 F.3d at 1145 (quoting *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991)). The panel emphasized that "the law should provide as strong an incentive as possible for employers to write the SPDs so they are consistent with the ERISA plan master documents, a relatively simple task." *Id.* When the Fifth Circuit decided that reliance was unnecessary, it relied on the same reasoning from *Hansen*. *Washington*, 497 F.3d at 458–59 (finding that a no-reliance rule was "most consistent with our opinion in *Hansen*, which refused to place the burden of con-

flict SPDs on plan beneficiaries"). The court believes that the Ninth Circuit would come to the same conclusion given its endorsement of *Hansen* in *Bergt.*

Whereas the Ninth Circuit has extolled accuracy in SPDs as a paramount virtue, it has never suggested that it is concerned about a windfall from an inaccurate SPD. The *Skinner* court cited one Ninth Circuit opinion as to that issue, but that panel's concern was not a windfall to beneficiaries resulting from the interpretation of an SPD, but rather a windfall resulting from misinterpretation of ERISA statutes themselves. *Bance v. Alaska Carpenters Retirement Plan*, 829 F.2d 820, 825 (9th Cir. 1987) (quoted in *Skinner*, 2010 WL 679061, at *7, 2010 U.S. Dist. LEXIS 6591, at *26.). Statutes are not written for laymen; SPDs are. Avoiding windfalls arising out of errors in SPDs is a legitimate concern, and one that has motivated at least some circuit courts that have imposed a reliance requirement. *E.g., Mathews v. Sears Pen. Plan*, 144 F.3d 461, 468–69 (7th Cir.1998) (cited in *Skinner*, 2010 WL 679061, at *7, 2010 U.S. Dist. LEXIS 6591, at *26). The Ninth Circuit, however, has emphasized the need for accuracy without expressing concern about unintended windfalls. Cf. *Bergt*, 293 F.3d at 1146 n. 3 (noting "that the affirmative defenses of fraud and estoppels are available to plan administrators against employees seeking benefits").

As the court previously noted, Defendant also urges the court to reach the same result as three district courts who imposed reliance requirements: *Adams, Berry,* and *Bertozzi. Skinner* cites all three cases approvingly. Each of them precedes *Bergt.* For example, in *Berry*, 815 F.Supp. at 364, the court adopted a reliance requirement because it did "not find the reasoning of *Edwards* as convincing as that of *Branch.*" In light of the reasoning of *Bergt*, which cited *Edwards*, this court believes that the Ninth Circuit would reach a different result. The *Ber-*

*tozzi* court characterized the discussion of reliance in *Edwards* and *Hansen* as dicta, 849 F.Supp. at 698, but that was before *Bergt* adopted reasoning from *Hansen* that, in this court's view (and the view of the Fifth Circuit in *Washington* ), leads ineluctably to the conclusion that reliance is not necessary. The *Adams* court merely followed *Kaiser* and *Berry*, 865 F.Supp. at 1460, and did so without the benefit of *Bergt.*

The decision of the district court in *Lancaster v. United States Shoe Corp.*, 934 F.Supp. 1137 (N.D.Cal.1996), decided after *Adams, Berry,* and *Bertozzi*, but before *Bergt*, gives another compelling basis to conclude that the Ninth Circuit would not impose a reliance requirement. The *Lancaster* court observed that in cases where a plan is ambiguous or contains inconspicuous exclusions, a court must look to "objectively reasonable expectations" to interpret the plan. *Lancaster*, 934 F.Supp. at 1154 (quoting *Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 387 (9th Cir. 1994)). Thus, for ambiguous plans, the Ninth Circuit looks not to whether a participant relied on the plan, but solely to objectively reasonable coverage expectations. As the *Lancaster* court aptly stated, "it would be anomalous, at best, to impose a reliance requirement [for unambiguous SPD statements]" but to impose no such requirement for ambiguous SPD statements. *Id.* at 1155 (noting if participants were required to prove reliance, "it would become more difficult for a clear SPD to supersede a conflicting plan than for an ambiguous SPD to do the same!").

One other observation about *Bergt* bears on the reliance question. *Bergt* had no occasion to address reliance, and the court does not imply otherwise. If *Bergt* had imposed a reliance requirement, however, Mr. Bergt would have recovered nothing. The dispute in *Bergt* arose when Mr.

Bergt applied for benefits under his retirement plan sixteen years after the inception of the plan. *Bergt,* 293 F.3d at 1141. Plan administrators denied his application, deeming him ineligible because of his participation in the company's profit sharing plan. *Id.* Among other rulings, the court of appeals held that the "district court's consideration of extrinsic evidence to resolve the conflict [between the master plan document and the SPD] was erroneous." *Id.* at 1145. That extrinsic evidence, which the district court summarized, suggested not merely that Mr. Bergt did not rely on the provision of the master plan he invoked, but that he was aware that the plan administrators interpreted the provision differently. *Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.,* 136 F.Supp.2d 1004, 1012 (D.Alaska 1999). He was never in sixteen years listed as a retirement plan participant. *Id.* at 1012. He had made statements indicating that he knew he was not subject to the retirement plan. *Id.* If he had ever attempted to participate in the retirement plan, he would have discovered that with one exception, every employee eligible for the retirement plan stopped participating in the profit sharing plan at the inception of the retirement plan. *Id.* Taken together, the evidence suggests that Mr. Bergt was aware that plan administrators did not interpret the plan to cover him while he participated in profit sharing. If Mr. Bergt relied on the master plan document at all, he did so silently, working for sixteen years before applying for benefits. Had Mr. Bergt appeared before the *Skinner* court, he would have lost. Yet the *Bergt* panel, reviewing his case and fully aware of the evidence demonstrating his lack of reliance, nonetheless held that the more favorable document applied.

The court believes that the Ninth Circuit would not impose a reliance requirement. Plaintiffs need not prove reliance in this case.

## IV. CONCLUSION

For the reasons stated above, the court rules that the unambiguous terms of the SPD made Plaintiffs 100% vested in the Plan upon its partial termination. The court rules that Plaintiffs need not prove reliance on the SPD.

Two issues remain for resolution. Whether Plaintiffs were subject to a partial termination, and, if they were, what relief the court should award them. The court observes that a motion to compel Defendant to produce documents (Dkt. # 83) will be ripe on April 16, 2010. The court directs the parties to meet and confer prior to that date to discuss a schedule for resolving these remaining issues, including a schedule for trial if necessary. The parties shall summarize their agreements or disagreements in a joint status report to be filed on April 16, 2010. The final resolution of this case, whether by trial or otherwise, will occur no later than the end of September, 2010. The court accordingly sets a trial date of September 20, 2010. The parties are welcome to agree to an earlier date if they prefer.